# Exhibit 2

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

-----------------------------x

JONATHAN MICHEL, on behalf   :
of himself and all others
similarly situated,          : Case No.

       Plaintiffs,          : 3:20-CV-01080-JCH

VS.                          :

YALE UNIVERSITY,             :

       Defendant.           :

-----------------------------x

    VIDEOTAPED DEPOSITION OF:  JONATHAN MICHEL

    DATE:  NOVEMBER 10, 2021

    TIME:  9:11 A.M.

    HELD AT:  WIGGIN AND DANA, LLP
            ONE CENTURY TOWER
            NEW HAVEN, CONNECTICUT

    REPORTED BY:  JACQUELINE V. McCAULEY
              PROFESSIONAL COURT REPORTER
              AND NOTARY PUBLIC


SUMMIT COURT REPORTING, INC.
Certified Court Reporters and Videographers
1500 Walnut Street, Suite 1610
Philadelphia, Pennsylvania  19102
424 Fleming Pike, Hammonton, New Jersey  08037
(215) 985-2400 * (800) 447-8648 * (609) 567-3315
www.summitreporting.com

**JONATHAN MICHEL**

```
 1                    JONATHAN MICHEL, having been
 2          first duly sworn to tell the truth, was
 3          examined and testified as follows:
 4                    COURT REPORTER:  Name and address,
 5   please.
 6                    MR. MICHEL:  Jonathan Michel, 71
 7   Bristol Street, New Haven, Connecticut 06511.
 8                    COURT REPORTER:  Thank you.
 9                    MR. CHAIT:  You may proceed.
10           DIRECT EXAMINATION BY MR. FREIMAN:
11        Q.   Thanks.  Do you prefer Mr. Michel,
12   Jonathan, John?  How would you like me to address you
13   at this deposition?
14        A.   Anything is fine.  Whatever you usually
15   do.
16        Q.   Okay.  And you understand that you're
17   here, because, obviously, you filed this lawsuit, and
18   this is part of what we call discovery?
19        A.   Yes.
20        Q.   As the name suggests, we're aiming to
21   discover things, what your claims are, what your
22   theories are, what your experiences have been, so I'm
23   going to ask you questions, and you will answer them.
24                    We'll try not to talk over each
25   other, which will be very helpful to our court
```

JONATHAN MICHEL

```
 1                    (Defendant's Exhibit 4, marked for
 2                    identification.)
 3          Q.  Okay.  I'm handing you what's been marked
 4   as Defendant's Exhibit 4, and you'll see that this is
 5   addressed to you, correct?
 6          A.  Yes.
 7          Q.  And it's titled Financial Aid Award and
 8   Planning Worksheet 2019-2020, right?
 9          A.  Yes.
10          Q.  I just want to direct your attention to
11   that first big box, Estimated Cost to Attend Yale.
12   Strike that.  Let me ask you first have you seen this
13   before?
14          A.  Yes.
15          Q.  And you received it?
16          A.  Yes.
17          Q.  From Yale?
18          A.  Yes.
19          Q.  Okay.  Now, I'm going to direct your
20   attention to that box, and there's a list of items on
21   the left and numbers on the right.  On the left
22   there's tuition, room and board, and student activity
23   fee.  Do you see those three?
24          A.  Yes.
25          Q.  And then there's a total that's says,
```

**JONATHAN MICHEL**

1  "Billed expenses of $72,225," correct?
2       A.  Yes.
3       Q.  Did you or did anyone on your behalf pay
4  $72,225 to Yale for 2019-2020?
5       A.  I believe -- Does that include the Yale
6  scholarship?
7       Q.  Well, my question is whether you or anyone
8  on your behalf paid $72,225 as opposed to some other
9  amount.
10      A.  I believe that is -- I believe we paid for
11 the billed expenses minus the gift aid.
12      Q.  All right.  You referenced the gift aid.
13 That's the next box, and it says on the right, "Gift
14 aid does not need to be repaid," right?
15      A.  Yes.
16      Q.  So that total of $45,451 in total gift aid
17 listed here is money that you did not pay, correct?
18      A.  Yes.
19      Q.  And your parents did not pay, correct?
20      A.  Yes.
21      Q.  Now, going up to the box above it, again,
22 where it says, "Estimated cost of attendance,
23 $76,775," that appears to include the billed expenses
24 of $72,225 plus two more rows, one of which is
25 books/personal expenses $3,700, and travel expenses

JONATHAN MICHEL

1  Is that your response?
2       A.  I do not know what it is, no.
3       Q.  Okay.  Did you, at any time before you
4  started at Yale, read the Handbook for Instructors of
5  Undergraduates at Yale College?
6       A.  No.
7       Q.  Do you know what that is?
8       A.  I believe I have heard of it.
9       Q.  Okay.  But you didn't read it before you
10 --
11      A.  I did not, no.
12      Q.  Okay.  So in choosing to come to Yale you
13 weren't relying on anything that was said in the
14 faculty handbook or the Handbook for Instructors of
15 Undergraduates at Yale College, correct?
16      A.  Yes.
17      Q.  Moving forward in time now in your
18 freshman year.  So let me ask you some questions about
19 that first year.  First of all, where did you live
20 first year?
21      A.  I lived in Welch Hall.
22      Q.  And is that affiliated with Davenport?
23      A.  Yes.  It is where the first years for
24 Davenport live.
25      Q.  It's on old campus?

JONATHAN MICHEL

```
 1          A.  Yes.
 2          Q.  And that's true, isn't it.
 3          A.  Yes.
 4          Q.  Paragraph 45 states, "Through the
 5   Admission Agreement and payment of tuition and fees,
 6   Plaintiff and each member of the class entered into a
 7   binding contract with Defendant."  Did I read that
 8   correctly?
 9          A.  Yes.
10          Q.  And that's true, too, isn't it?
11              MR. SOUMILAS:  I'll object to the
12   form of that question to the extent it calls for a
13   legal conclusion, attorney/client communications or
14   assumes facts not in evidence.  You can answer.
15          A.  I don't remember signing the contract.
16          Q.  This states that Plaintiff and each member
17   of the class entered into a binding contract with
18   Defendant.  It doesn't say signed, and it's true that
19   you entered into a binding contract with Yale, isn't
20   it?
21              MR. SOUMILAS:  I'll object to the
22   question for the same bases as before, and you can
23   answer.
24          A.  I don't remember doing any kinds of legal
25   agreements or contracts with Yale when I began to pay
```

JONATHAN MICHEL

1  tuition.
2       Q.  Paragraph 48, let's turn to that also in
3  Exhibit 1.  It says, "Defendant has failed to provide
4  the contracted-for services and has otherwise not
5  performed under the contract as set forth above."  Is
6  that true?
7            MR. SOUMILAS:  Same objections as to
8  calling for legal conclusions, assuming facts not in
9  evidence, lacking a foundation, and you can answer
10 that question.
11      A.  I don't recall the existence of a
12 contract, so I can't say if that is true or not.
13      Q.  So would you say that Yale in fact has
14 provided the contracted-for services and has performed
15 under the contract?
16           MR. SOUMILAS:  I'll object on the
17 exact same basis.
18      A.  I would say that there isn't a contract.
19      Q.  There isn't a contract.  Okay.  In
20 paragraph 49 you state that "Plaintiff --" that's
21 you "-- and members of the class have suffered damage
22 as a direct and proximate result of Defendant's
23 breach, including but not limited to deprivation of
24 the education, experience, and services that they were
25 promised and for which they have already paid."  What

JONATHAN MICHEL

```
 1   are you saying here was promised?
 2                   MR. SOUMILAS:  I'll object to the
 3   form on all the same bases, and also in addition to
 4   the fact that you're using the term "you say" and "you
 5   stated."  This is an attorney-drafted document.  Don't
 6   put words in his mouth.
 7                   MR. FREIMAN:  John, for the record
 8   I'm not.  He's already testified that he read,
 9   approved, everything in the document is correct.
10                   MR. SOUMILAS:  That's not exactly
11   his testimony.
12                   MR. FREIMAN:  The record will
13   reflect his testimony.
14                   MR. SOUMILAS:  I'm not instructing
15   him not to answer.  I'm just making my objection in
16   specificity like you requested.
17                   MR. FREIMAN:  So what's the promise?
18   What was the promise?
19                   MR. SOUMILAS:  Same objections.  You
20   can answer.
21        A.   Okay.  I believe that we were promised an
22   experience at Yale University that included a wide
23   variety of programs that didn't include only academic
24   opportunities.  And when I visited the school Web page
25   and went to Bulldog Saturday, I was promised programs
```

1  such as study abroad, participation in in-person
2  clubs, the services of the residential college like
3  the gym and The Buttery, and that I was not able to
4  access or use any of these services when I was or when
5  Yale had closed its campus.
6      Q.  Okay.  Did Yale ever promise you that if
7  there were a pandemic, it would keep teaching all
8  classes in person?
9      A.  I'm not sure.
10     Q.  Did that subject ever come up?
11         MR. SOUMILAS:  I'm sorry, objection
12 to the form.  Come up where?
13     Q.  Did anyone at Yale, in any document or in
14 any in-person conversation prior to your matriculation
15 at Yale, ever promise you that if there were a
16 pandemic, Yale would keep teaching all classes in
17 person.
18     A.  I have never read documents or -- Before
19 COVID I have never read documents about Yale's
20 procedures following a pandemic or public health
21 crisis or had a conversation with anyone about that.
22     Q.  So no one had made you a promise that if
23 there were a pandemic, it would keep teaching all
24 classes -- Yale would keep teaching all classes in
25 person before you matriculated to Yale, correct?

1             A.   Can you say that again?
2             Q.   Yeah.  You just said you never had any
3    conversations with anyone about it before the
4    pandemic.  So that necessarily means, doesn't it, that
5    no one at Yale promised you that if there were a
6    pandemic, Yale would keep teaching all classes in
7    person, right?
8             A.   No administrator at Yale, before I
9    enrolled at Yale promised, me that I would be able to
10   go to in-person classes during a pandemic.
11            Q.   Did any documents promise you that?
12            A.   Not any documents that I ever read.
13            Q.   Okay.  You're not aware of any documents
14   that make that promise, right?
15            A.   I'm not aware.
16            Q.   Okay.  Did Yale ever promise you that if a
17   pandemic required it to teach classes online for some
18   period of time, it would refund tuition to you?
19            A.   I was never made that promise.
20            Q.   Okay.  Did Yale ever promise you that if
21   you thought classes weren't as good as you thought
22   they should have been, they would refund tuition to
23   you?
24            A.   No, I was never made that promise.
25            Q.   Did Yale ever promise you that if the

JONATHAN MICHEL

1  Government issued stay-at-home orders, and Yale had to
2  offer classes online, Yale would defy those orders and
3  keep teaching in person.
4      A.  I was never made that promise.
5      Q.  Okay.  Did Yale ever promise you that if
6  the Government issued stay-at-home orders, and Yale
7  had to offer classes online, it would refund tuition
8  to you?
9      A.  I was never made that promise.
10     Q.  I'm trying to understand the promise you
11 think that Yale made in the context of a pandemic and
12 shutdown orders.  What was it?
13         MR. SOUMILAS:  Objection to the form
14 of the question.  You can answer it.
15     A.  I think the promise that was made to Yale
16 was that in agreement for my paying tuition to Yale,
17 they would provide me with a wide variety of services
18 that were not able to be offered during a pandemic
19 even though I continued to pay, actually, an increased
20 price in tuition during the pandemic.
21     Q.  Okay.  Can you be -- Can you state the
22 promise any more precisely or is that the clearest and
23 most precise formulation of the promise you can offer?
24     A.  The most precise formulation of the
25 promise I can offer is that I was promised an

1  experience at Yale University, not just an education,
2  and an experience that consisted of in-person
3  communities, residential colleges, clubs, just a wide
4  variety.  I can't possibly begin to start to name
5  every single service that Yale has to offer or that
6  Yale advertises to you when you are considering
7  whether to go to school there.
8          Q.  Okay.  So that was -- You're anticipating
9  my next question I was going to ask.  What's the
10 source of this promise that you've just enunciated?
11         A.  I think the source of this promise is the
12 advertising done by Yale University to people that I
13 spoke to about Yale University, the things I read
14 about Yale University, the visit I did to Yale, just
15 every material that I used to make my decision when I
16 came here.
17         Q.  Okay.  Let's break those down.  I want to
18 ask you about when you came to visit Yale, what did
19 representatives of Yale say to you?  What was the
20 promise that you think they made?  What do you
21 remember them saying?
22                 MR. SOUMILAS:  Object to the form of
23 the question.  You can answer it.
24         A.  I remember -- Let's see.  This was a while
25 ago, so my memory is a little hazy, but I remember

```
 1  form.  He didn't say that.  You can answer.
 2          Q.  Is that your testimony?
 3          A.  Well, I won't say that it was worth
 4  nothing, but I'm certain that the tuition I paid for
 5  those five weeks was not accurately reflected in the
 6  benefits that I received, but I will agree that it
 7  should not be worth those five weeks of class are
 8  worth nothing.
 9          Q.  Your contention is that you got some value
10  out of it, but it wasn't the full value.
11                  MR. SOUMILAS:  I'll object to the
12  form.  You can answer.
13          A.  For those five weeks, yes.
14          Q.  Okay.  And you got credits for all your
15  classes, right?
16          A.  I did.
17          Q.  And they progressed toward the degree,
18  right?
19          A.  Yes.
20          Q.  You expect to graduate on time this
21  spring?
22          A.  Yes.
23                  MR. SOUMILAS:  Jonathan, will you
24  please let me know when we can take another
25  five-minute break, please?
```

JONATHAN MICHEL

1           identification.)
2           Q.   And this is entitled Yale College Programs
3    of Study Fall/Spring Terms, right?
4           A.   Yes.
5                MR. SOUMILAS:  I want to note for
6    the record this one's not Bates stamped and, I don't
7    know, I guess it would be part of the transcript.  I
8    want the record to reflect that what was handed over
9    was something that looks like, I don't know, several
10   hundred pages of -- as part of the Programs of Study.
11   Do you know how many pages this is?
12               MR. FREIMAN:  I don't have an exact
13   count.
14               MR. SOUMILAS:  It looks about two
15   and half inches thick double-sided as far as I can
16   tell.
17          A.   It looks like 700 -- There's a page count.
18          Q.   Yeah, that's okay.  It will be an exhibit
19   to the deposition, for the record.
20          A.   Okay.  I believe 787 is the last page.
21          Q.   Okay.  And this is dated at the bottom
22   right as June 30, 2019, right?
23          A.   Yes.
24          Q.   And by its title it refers to both the
25   fall and spring terms of 2019-2020, right?

```
 1              A.   Yes.
 2              Q.   Are you familiar with any other names that
 3    this may go by?
 4              A.   I believe it goes by the Blue Book.
 5              Q.   Blue Book?  Okay.
 6              A.   Yeah.
 7              Q.   All right.  Is it sometimes called The
 8    Bulletin?
 9              A.   I have never heard it referred to as that.
10              Q.   Okay.  And in what ways do you know that
11    -- How do you know it's called the Blue Book?
12              A.   It's not really referred to it as,
13    referred to it as such anymore.  But when I was a
14    first year, I remember we -- This would be the booklet
15    that had all the classes, and it would be a blue book,
16    and when you would like sign up for classes with your
17    friends or clubs, you would call it blue booking, and
18    so it was referred to as, yeah, as the Blue Book, but
19    I've never actually had a physical copy of it.
20              Q.   Yeah.  You would look at it online, right?
21              A.   Yeah.
22              Q.   And you looked at it online as a freshman,
23    yeah?
24              A.   Yes.
25              Q.   Okay.  Back to 2.  All right.  Let's look
```

```
 1   Regulations?
 2         A.   Yes.
 3              MR. SOUMILAS:  Thank you.
 4         Q.   And have you had access in the past to the
 5   Yale College Undergraduate Regulations?
 6         A.   I believe so, yes, through the Internet.
 7         Q.   Okay.  You are, in this lawsuit, bringing
 8   claims on behalf of a punitive class of all students
 9   at every school at the University from spring 2020
10   onwards.  You understand that, right?
11         A.   Yes.
12         Q.   So, for instance, you're bringing claims
13   on behalf of all students at the Yale School of Music.
14   You understand that, right?
15         A.   Yes.
16         Q.   Do you know how much students at the Yale
17   School of Music pay to go to Yale?
18         A.   I'm not sure.
19         Q.   Tell me what you know about how the
20   experience for Yale School of Music students changed
21   from when the pandemic hit.
22              MR. SOUMILAS:  I'll object to the
23   extent it lacks foundation or calls for speculation,
24   but --
25              MR. FREIMAN:  I just said tell me
```

1      Q.  You know it costs to educate its students,
2  right?
3      A.  Yes.
4      Q.  And those costs are covered, in part, by
5  income on the endowment and gifts, right?
6      A.  Yes.
7      Q.  So tuition only reflects a portion of the
8  actual cost to educate Yale students, correct?
9           MR. SOUMILAS:  Object to the form.
10     A.  That makes sense.
11     Q.  All right.  That's it for me.
12          CROSS-EXAMINATION BY MR. SOUMILAS:
13     Q.  Oh, wow, terrific.  So we don't need to
14 take a break, but I have two followups.  Mr. Michel,
15 earlier counsel for Yale was asking you about
16 marketing material and your understanding at the time
17 you accepted the offer to come here.  Do you recall
18 that testimony?
19     A.  Yes.
20     Q.  And based on that material was it your
21 understanding at the time you accepted the offer to
22 come to Yale that it would be on campus here in New
23 Haven.
24     A.  Yes.
25     Q.  And was it your understanding that the

JONATHAN MICHEL

```
 1   classes that your professors would offer would be
 2   given on campus here in New Haven.
 3         A.  Yes.
 4         Q.  And then after you got here I think we
 5   referenced this very large book that you said is the
 6   Blue Book.  Do you remember that testimony?
 7         A.  Yes.
 8         Q.  And does the Blue Book have course
 9   descriptions of the type of classes students at Yale
10   College could take?
11         A.  I believe so, yes.
12         Q.  And is it your understanding that those
13   courses would be offered at a specific time and
14   building on the New Haven Yale campus.
15         A.  Yes.
16               COURT REPORTER:  Sorry, and?
17               MR. SOUMILAS:  On the New Haven Yale
18   campus.
19               COURT REPORTER:  Thank you.
20         Q.  And is that in fact what happened through
21   the beginning of the spring of 2020 semester but
22   before the pandemic?
23         A.  Yes.
24         Q.  I don't have anything else.
25
```

```
 1                CERTIFICATE OF REPORTER
 2           I, Jacqueline V. McCauley, a Notary Public
 3   duly commissioned and qualified in and for the State
 4   of Connecticut, do hereby certify that pursuant to
 5   Notice, there came before me, on the 10th day of
 6   November, 2021 at 9:11 a.m., the following named
 7   person, to wit:  JONATHAN MICHEL, who was by me duly
 8   sworn to testify to the truth and nothing but the
 9   truth; that he was thereupon carefully examined upon
10   his oath and his examination reduced to writing under
11   my supervision; that this deposition is a true record
12   of the testimony given by the witness.
13           I further certify that I am neither attorney
14   nor counsel for, nor related to, nor employed by any
15   of the parties to the action in which this deposition
16   is taken, and further, that I am not a relative or
17   employee of any attorney or counsel employed by the
18   parties hereto, or financially interested in the
19   action.
20           IN WITNESS HEREOF, I have hereunto set my hand
21   and affixed my seal this 17th day of November, 2021.
22                                   Jacqueline V. McCauley
23                                   Notary Public
24
25   My Commission expires:  5/31/2025
```