Exhibit 30

# REBUTTAL DECLARATION
## OF
# GARETH MACARTNEY, PH.D.

**In the matter of**

*JONATHAN MICHEL v.*
*YALE UNIVERSITY*
*USDC, District of Connecticut, Case No. 3:20-cv-01080-SALM*



**OnPoint Analytics, Inc.**

**June 10, 2022**

# TABLE OF CONTENTS

I.     INTRODUCTION...........................................................................................................................1

II.    DR. TOMLIN MISINTERPRETS THE DATA ON IN-PERSON TUITION FEES COMPARED TO ONLINE TUITION FEES ........................................................................................3

III.   DR. TOMLIN'S ECONOMICS CONCERNING TUITION FEES AND STUDENTS' WILLINGNESS TO PAY IS WRONG OR BESIDE THE POINT ........................................................6

IV.    DR. TOMLIN IS WRONG ABOUT THE RELEVANCE OF FINANCIAL AID ...................10

V.     DR. TOMLIN IS WRONG THAT THE METHODS I PROPOSE ARE NOT TAILORED TO THIS CASE ..................................................................................................................................12

VI.    CONCLUSION..........................................................................................................................15

i

## I.  INTRODUCTION

1.   I am a Senior Economist, the Director of Competition, and Chief Executive Officer at OnPoint Analytics, Inc., an economic and statistical consulting firm. This case concerns the tuition charged by Defendant Yale University, a private Ivy League university in New Haven, Connecticut, during the COVID-19 pandemic. On March 10, 2020, Yale first announced it was moving classes and other in-person services and activities online due to COVID-19.[1] Yale kept substantially all classes and other services and activities online for the remainder of the Spring 2020 semester and the entirety of the Summer 2020, Fall 2020, and Spring 2021 semesters.[2] Unlike some other universities such as Princeton and Georgetown that reduced their tuition by 10%, Yale charged tuition and fees equal to or greater than what it previously charged for in-person instruction.[3] Yale did not offer tuition refunds.[4] It is my understanding that Plaintiff on behalf of himself and a putative Class of others similarly situated seeks to recover as damages a refund of their tuition payments in proportion to the difference in market value between the on-campus educational experience they allege Yale promised, and the online experience they received.

2.   I was asked by Plaintiff's counsel to investigate if feasible methods exist to estimate Class-wide damages. I submitted a declaration on February 4, 2022, in which I "concluded[d]

---

[1] Second Amended Class Action Complaint and Demand for Jury Trial, filed July 29, 2021 ("Complaint"), at ¶25; Yale University's Answer and Affirmative Defenses To Plaintiff's Second Amended Class Action Complaint, filed September 20, 2021 ("Answer"), at ¶25.
[2] Complaint, at ¶¶25-27, 31, 40-41; Defendant's Objections and Responses to Plaintiff's First Set of Interrogatories, April 20, 2021, at pp. 4-7.
[3] Complaint, Exhibits 2 & 3; Answer, at ¶32; Aratani, Lauren, "'Zoom University': is college worth the cost without the in-person experience?", *The Guardian*, October 6, 2020, accessed January 29, 2022 at https://www.theguardian.com/world/2020/oct/06/zoom-university-college-cost-students-in-person-experience.
[4] Answer, at ¶41.

1

that there are widely accepted and feasible methodologies for calculating the Class-wide damages alleged in this case," including through the use of professionally accepted methodologies such as hedonic regressions and conjoint survey analysis.[5] In response to my Initial Declaration, Yale has submitted an expert report by Dr. Jonathan Tomlin, which levels certain criticisms at my proposed methodologies for calculating Class-wide damages.[6] I have been asked by Plaintiff's counsel to evaluate Dr. Tomlin's report and I do so in this Rebuttal Declaration. Dr. Tomlin's Report contains his interpretation of certain data on in-person tuition fees versus online tuition fees. Dr. Tomlin also puts forth certain economic theories, particularly around the pricing of college tuition and students' willingness to pay. In this Rebuttal Declaration, I describe the ways in which Dr. Tomlin has misinterpreted the data and why his economic theories are wrong, beside the point, or both. In short, nothing that Dr. Tomlin offers changes my opinion that there exist widely accepted and feasible methodologies for calculating the Class-wide damages alleged in this case using evidence common to the Class.

3. The rate charged for my time spent on this matter remains unchanged from my Initial Declaration. Again, I was supported in my work by the staff of OnPoint Analytics, Inc., and their time was billed at the same rates as for my Initial Declaration. An updated version of my *curriculum vitae* is attached as Exhibit A, including a list of my expert testimony and reports. The materials I reviewed and relied upon for this Rebuttal Declaration are listed in Exhibit B.

---

[5] Declaration of Gareth Macartney, Ph.D., in the matter of Jonathan Michel v. Yale University, USDC, District of Connecticut, Case No. 3:20-cv-01080-SALM, dated February 4, 2022 (hereafter, "my Initial Declaration" or "Initial Macartney Declaration"), at §V, §VI, ¶68.

[6] Expert Report of Jonathan T. Tomlin, Ph.D., in the matter of Jonathan Michel v. Yale University, USDC, District of Connecticut, Case No. 3:20-cv-01080-SALM, dated June 3, 2022 (hereafter, "Dr. Tomlin's Report" or "Tomlin Report").

## II. DR. TOMLIN MISINTERPRETS THE DATA ON IN-PERSON TUITION FEES COMPARED TO ONLINE TUITION FEES

4.  Dr. Tomlin criticizes the evidence I used to compare in-person and online tuition fees, but he misinterprets the data he cites as showing that online programs were priced either the same or more expensive as in-person. A frequent theme of his criticism is that I do not "consider the specifics of the education provided by Yale" and cite to sources "outside the context of the pandemic."[7] In fact, I did cite to sources specific to Yale and the pandemic. For instance, I cited letters I reviewed from classes of Yale students faced with the transition to online learning during the COVID-19 pandemic. In my Initial Declaration, I described the June 17, 2020 letter from Yale's incoming School of Art class calling for reductions in fall tuition "to reflect any lack of in-person class, critiques, or shop access," among other requests.[8] Another letter sent March 23, 2020 by Yale students requested "[c]ompensation for the compromised quality of education and loss of prepaid services" among other requests.[9] This letter described a survey finding that 81% of students thought a move to remote instruction would have a negative impact on their education.[10] A similar April 2020 survey of Yale School of Management students revealed many students expressing concerns that the shift to online education "has detracted from the learning environment, lowering student engagement and classroom dynamics that are so unique to a

---

[7] Tomlin Report, at ¶21. I note, however, that Dr. Tomlin himself relies on an article that, although written during the COVID-19 pandemic, uses data prior to the pandemic: Tomlin Report, at ¶21 & 28 citing Hemelt, Steven W. and Kevin M. Stange, "Why the move to online instruction won't reduce college costs," July 28, 2020, accessed June 8, 2022 at https://www.brookings.edu/blog/brown-center-chalkboard/2020/07/28/why-the-move-to-online-instruction-wont-reduce-college-costs/.

[8] Macartney Declaration, at ¶49; Email dated June 17, 2020, from Yale MFA 2022 to Marta Kuzma, YU-0000016105-6115, at -6110-6112.

[9] "Letter from YSoA students regarding responses to COVID-19," March 23, 2020, YU-0000000690-696, at -690-696.

[10] "Letter from YSoA students regarding responses to COVID-19," March 23, 2020, YU-0000000690-696, at -690-693.

business school experience."[11] Over 80% of respondents expressed dissatisfaction with Yale's decision not to provide tuition reimbursement, and over 90% of survey participants expressed disagreement with Yale's tuition *increase* for the 2020-2021 academic year.[12] Half of the surveyed Class of 2021 students were considering a leave of absence due to the diminished academic experience of virtual education.[13] Indeed, Yale reported that in Fall 2019, 99% of first-year students returned for their sophomore year whereas in Fall 2020, 65% of first-year students returned for their sophomore year.[14]

5. Dr. Tomlin argues that the article I cited to for the average prices of online versus in-person programs "is not an 'apples to apples' comparison as there are different colleges within the two averages."[15] *First*, Dr. Tomlin criticizes this list for not including any Ivy League schools, even though this is simply the result of inclusion being predicated on whether a school participated in U.S. News's survey.[16] *Second*, he apparently ignores the next paragraphs in my Initial Declaration, wherein I provide examples of the price differential between in-person and online instruction *within the same institutions*. Specifically, I show that the in-person price is **$790 *more*** per-credit for the Johns Hopkins University MBA program, at least **$93 *more*** for the University of Illinois – Chicago's Bachelor of Science in Health Information Management program, at least **$187 *more*** for the University of Illinois – Chicago's Bachelor of Business

---

[11] SOM Student Government, "Supplement: Student Feedback on SOM COVID-19 Response," April 2020, YU-0000034090-092, at -090.
[12] SOM Student Government, "Supplement: Student Feedback on SOM COVID-19 Response," April 2020, YU-0000034090-4092, at -091.
[13] SOM Student Government, "Supplement: Student Feedback on SOM COVID-19 Response," April 2020, YU-0000034090-4092, at -092.
[14] Yale, "Yale Facts," accessed February 3, 2022 at https://www.yale.edu/about-yale/yale-facts.
[15] Tomlin Report, at ¶22.
[16] "All online programs that participated in U.S. News' data collection are in the directory, whether ranked or unranked" (U.S. News & World Report, "Methodology: Best Online Bachelor's Programs Rankings," accessed June 7, 2022 at https://www.usnews.com/education/online-education/articles/bachelors-methodology).

Administration program, and **$59 *more*** for Colorado State University's undergraduate degrees.[17] I also cite to an Education Data Initiative article that compares program costs within the same school.[18]

     6. Dr. Tomlin reviews the Education Data Initiative article I cited that compares the costs of online and in-person programs, and picks at a small portion of the article which evaluates only five programs where the price differential between the online and in-person offering varies.[19] Dr. Tomlin chooses to ignore the fact that the only private university reviewed in this comparison of five schools had a large price premium – Embry-Riddle Aeronautical University had an online credit hour tuition of $447, while its on-campus credit hour tuition was $1,563.[20] Dr. Tomlin then criticizes my example comparison of a few specific programs, stating that he is "surprised" I would use only these examples to "draw such a sweeping conclusion."[21] His reaction mischaracterizes the articles and studies I cited that also came to the same conclusion using a larger sample size. In the Education Data Initiative article, the authors found that:[22]

> *For public 4 year colleges, when tuition and the cost of attendance are compared between an online degree and an in-person degree, the online degree is **$10,776** cheaper.*

---

[17] Macartney Declaration, at ¶¶30-32.
[18] Macartney Declaration, at ¶28; Hanson, Melanie, "Cost of Online Education vs. Traditional Education," *Education Data Initiative*, August 18, 2021, accessed January 30, 2022 at https://educationdata.org/cost-of-online-education-vs-traditional-education.
[19] Tomlin Report, at ¶24.
[20] Hanson, Melanie, "Cost of Online Education vs. Traditional Education," *Education Data Initiative*, August 18, 2021, accessed January 30, 2022 at https://educationdata.org/cost-of-online-education-vs-traditional-education.
[21] Tomlin Report, at ¶25.
[22] Hanson, Melanie, "Cost of Online Education vs. Traditional Education," *Education Data Initiative*, August 18, 2021, accessed January 30, 2022 at https://educationdata.org/cost-of-online-education-vs-traditional-education (bolding in original).

*Private institutions on average charge **$58,560** for an online degree vs $148,800 for an in-person degree.*

*The average per-credit-hour, in-state tuition rate in the U.S. among private schools for the 2019-20 academic year was **$1,240** for in-person instruction and **$488** for online instruction*

7.  The Education Data Initiative article also highlighted that "[s]tudents have also called for tuition refunds and generally lower prices due to their perceived lower quality of online instruction."[23] Ignoring these results based on large sample sizes, Dr. Tomlin offers examples of Ivy League schools which charged the same tuition for both in-person and online instruction, but he only references three master's degree programs.[24] Hardly sufficient for Dr. Tomlin to draw his own "sweeping conclusions."

### III.  DR. TOMLIN'S ECONOMICS CONCERNING TUITION FEES AND STUDENTS' WILLINGNESS TO PAY IS WRONG OR BESIDE THE POINT

8.  Dr. Tomlin argues that standard economic tools such as hedonic regression and conjoint analysis cannot be used to calculate a market value for in-person college tuition because of the nature of the market for college tuition. Dr. Tomlin argues "[t]he college tuition 'market' is not such a traditional economic market" because "Yale does not set prices to maximize its profits and many Yale students only pay based on their ability to pay and not based on tuition prices."[25] However, economists have recognized that although institutions providing higher education many not strictly speaking maximize profit, they are motivated by improving the quality of the educational services they supply and the overall revenues they earn, both in the

---

[23] Hanson, Melanie, "Cost of Online Education vs. Traditional Education," *Education Data Initiative*, August 18, 2021, accessed January 30, 2022 at https://educationdata.org/cost-of-online-education-vs-traditional-education.
[24] Tomlin Report, at ¶27.
[25] Tomlin Report, at ¶36.

form of tuition fees and alumni donations.[26] Economists have found that while colleges may not be "profit maximizing" they are "prestige maximizing."[27] That prestige drives revenue. Hence, price and quality matter and colleges too are subject to the forces of demand.

9. For the customers of college services, *i.e.,* students, higher education is an investment in their own human capital.[28] The fact that colleges like Yale charge students a price below the cost of providing them an education even if true, as Dr. Tomlin argues, does not negate the fact that the demand for Yale's services changes with the "net price" (after accounting for subsidies such as aid and scholarships) that Yale students and their families expect to pay out-of-pocket. The price Yale's customers are willing to pay depends on the perceived value of what they expect to receive as traditional economics would predict. This is recognized in the literature on the market structure of higher education which notes that students are "attracted to a college by 'a good deal;' they want to get the most for their money which means paying as little as they can for a dollar's worth of educational quality."[29] The article Dr. Tomlin himself cites states that student demand for higher education "must surely be influenced by what a student gets and what that student pays."[30]

---

[26] Winston C. Gordon, "Subsidies, Hierarchy and Peers: The Awkward Economics of Higher Education," Journal of Economic Perspectives, Winter, 1999, at p. 16.; Hoxby, Caroline M., "The Economics of Online Postsecondary Education: MOOCs, Nonselective Education, and Highly Selective Education," The American Economic Review – Papers & Proceedings 104, no. 5 (May 2014): 528-533 at p. 529.
[27] Winston C. Gordon, "Subsidies, Hierarchy and Peers: The Awkward Economics of Higher Education," Journal of Economic Perspectives, Winter, 1999, at p. 16.
[28] Winston C. Gordon, "Higher Education's Costs, Prices, and Subsidies: Some Economic Facts and Fundamentals," December 2001, National Center for Education Statistics, Postsecondary Education Descriptive Analysis Reports, p. 120.
[29] Winston, Gordon C. (2000), "The Positional Arms Race in Higher Education." Discussion Paper, at p. 8.
[30] See Tomlin Report, fn. 66; Winston C. Gordon, "Subsidies, Hierarchy and Peers: The Awkward Economics of Higher Education," Journal of Economic Perspectives, Winter, 1999.; See also Hoxby (1997) which agrees that colleges compete for students on the value (quality for cost) they deliver (Hoxby, Caroline, (1997), How the Changing Market Structure of U.S. Higher Education Explains College Tuition, No 6323, NBER Working Papers, National Bureau of Economic Research, Inc., at p. 1-2.)

7

10. Dr. Tomlin also ignores that students are both consumers and future revenue inputs, from the perspective of the college.[31] That is, economic models recognize that colleges make investments in each student, and they expect to earn an equity-like return on their investments in the form of alumni donations.[32] Thus, Yale competes with other institutions in the market for the high-quality students that will generate future revenue. Dr. Tomlin himself recognizes that when Yale sets its tuition fees it considers the fees charged by other "peer" schools,[33] which demonstrates (although Dr. Tomlin appears not to realize this) that Yale competes with other colleges on price.

11. Any school's access to good students, then, depends on its position regarding quality and price relative to other schools. One article finds that "[c]ompetition through spending has long been the chosen mechanism for repositioning subsidies increased by offering more product and better with less increase in price."[34] Even if tuition fees are set below cost, the financial model under which colleges operate is dependent on "non-tuition" revenue such as donations from alumni, as well as endowment performance. They attract good students (as consumers and as inputs) and to do so they need to provide a quality educational experience at market prices reflecting that quality. An article in the literature states that colleges consider their "need for a

---

[31] Hoxby, Caroline M., "The Economics of Online Postsecondary Education: MOOCs, Nonselective Education, and Highly Selective Education," The American Economic Review – Papers & Proceedings 104, no. 5 (May 2014): 528-533.; Winston C. Gordon, "Subsidies, Hierarchy and Peers: The Awkward Economics of Higher Education," Journal of Economic Perspectives, Winter, 1999, at p. 17.
[32] Hoxby, Caroline M., "The Economics of Online Postsecondary Education: MOOCs, Nonselective Education, and Highly Selective Education," The American Economic Review – Papers & Proceedings 104, no. 5 (May 2014): 528-533.
[33] Tomlin Report, ¶38, 59
[34] Winston, Gordon C. (2000), "The Positional Arms Race in Higher Education." Discussion Paper, at p. 13.

robust revenue stream to keep their institution competitive, and families' willingness—or in many cases unwillingness— to pay the published price."[35]

12. Dr. Tomlin also argues that "[a] reliable calculation of 'market price' in this case would need to consider…when Yale may have incurred increased costs during the pandemic."[36] This contradicts Dr. Tomlin's own view that costs are not a factor in Yale's determination of price.[37] When Yale sets it tuition price, according to Dr. Tomlin, it does not seek to recover its costs. And as I have described above, Yale seeks good students, and expects to recover its costs from non-tuition revenues such as future alumni donations, as well as in part, through tuition fees. Therefore, it is not correct to assume as Dr. Tomlin does, that higher costs (if there were any) faced by Yale due to the pandemic should be passed through as higher tuition fees to students. But regardless, the effect of any increase in costs on tuition fees could be considered on a Class-wide basis by using data that Yale has on the incremental costs of providing its services, including during the COVID pandemic.

13. Dr. Tomlin mentions that Yale College is highly selective with an acceptance rate of only 7% and that there are many more students wishing to attend Yale College than there are available spots at the school.[38] He claims that this means that "even if [students] 'willingness to pay' declined with a change in Yale's educational offerings it may have been above the net price they paid."[39] But as a matter of economics, any consumer who purchases any product at a price is willing to pay that price *or higher*. It is the aggregation of all consumers' willingness to pay

---

[35] Lapovsky, Lucy, "Institutional Financial Health: Tuition Discounting and Enrollment Management," December 2001, National Center for Education Statistics, Postsecondary Education Descriptive Reports, p. 67.
[36] Tomlin Report, ¶59.
[37] Tomlin Report, ¶61.
[38] Tomlin Report, ¶13, 60.
[39] Tomlin Report, ¶60.

that determines the market price. If the quality of a product declines, aggregate willingness to pay declines, and the market price decreases. For Yale, this decline in demand occurs both from the students that end up attending Yale (the 7%) and from those that consider attending Yale but do not ultimately attend.

14. Finally, Dr. Tomlin ignores the repercussions of his observation that only 7% of students get into Yale, when he writes about the "reality…that students and their families continued to pay for tuition even for the 2020-2021 academic year when they would have been rationally aware of the possibility that some or all of their classes would be online."[40] That it is hard to get into Yale and that it requires substantial investment, planning, and effort, means that Class members were essentially captive to Yale's policies.

## IV. DR. TOMLIN IS WRONG ABOUT THE RELEVANCE OF FINANCIAL AID

15. Dr. Tomlin's arguments about the relevance of Yale's financial aid awards are similarly misplaced. He concludes that many Class members would not have sustained any economic injury "even if there were a 'price premium' [for in-person learning] on any of Yale's tuition prices," because if the premium was deducted from the full tuition fee amount it would not reduce the net fees paid by those who receive financial aid that is already larger than the premium reduction.[41]

16. However, Dr. Tomlin *assumes* that any reduction in tuition fees to compensate students for the loss of quality in their educational experience should be applied only to the *full* tuition fee. He argues that applying a "price premium" to students only paying their calculated

---

[40] Tomlin Report, ¶60.
[41] Tomlin Report, ¶63.

ability to pay would make no economic sense because it would result in some students paying less than their ability to pay.[42] But, Dr. Tomlin's argument implies that only students from the wealthiest families should be compensated for the reduction in the value of their college experience. But, that would make no economic sense, because reduction in value from the alleged conduct should not be dependent on family wealth, because it is experienced commonly across the student body and the putative Class. This is evident from the experience of students at Princeton, which discounted full tuition by 10% in response to the shift to online classes induced by COVID-19.[43] Princeton's 10% discount acknowledges the loss in value students suffer, something that Dr. Tomlin ignores. It also provides information on what that loss of value percentage may be and the appropriateness of applying a common percentage across classes and students. However, Princeton's policy was criticized for social inequity, since the tuition reduction applied to families that could afford to pay full fees, but families receiving partial aid were required to pay the same family contribution with no discount and for a less-than-ideal educational experience.[44] A more appropriate approach from an economics perspective, and one that renders Dr. Tomlin's argument moot, is a reduction in the prices students actually pay, *i.e.*, a reduction in *net* prices.

17. Moreover, as I described in my Initial Declaration, the relevant price which could be measured by a conjoint survey or hedonic regression is the *net* price that Yale students and their families pay and not the full price set by Yale. It is this net price that students and their families

---

[42] Tomlin Report, ¶64.
[43] The Daily Princetonian, "Why Princeton should make fall 2020 discounts apply to expected family contribution", June 21, 2020.
[44] *Id.*

ultimately pay, and it is this net price that they consider when making educational choices around quality and price.

## V.  DR. TOMLIN IS WRONG THAT THE METHODS I PROPOSE ARE NOT TAILORED TO THIS CASE

18. Dr. Tomlin argues that the conjoint analysis and hedonic regression techniques I propose in my Initial Declaration cannot be tailored to the specifics of this case. However, one of the advantages of conjoint analysis, for example, is in fact its ability to be tailored to specific samples and scenarios. It can, of course, consider the preferences of students at Yale, because the conjoint survey can be performed on a sample of Yale students, and it can be performed on samples across the different Yale schools, if deemed necessary. It can consider different scenarios, such as the partial online education that Dr. Tomlin seems so concerned about,[45] because the conjoint survey can be designed to weigh different options. Similarly, it can also consider scenarios and circumstances surrounding the COVID-19 pandemic, if deemed necessary. Also, it is irrelevant (even if true) that some students may have "perceived that they were not deprived of 'in-person' education," as Dr. Tomlin argues.[46] Because, as I have described previously, the market price for education is established by the aggregate demand across students. The price premium associated with the in-person educational experience that Yale students were deprived of is driven by that aggregate demand, and it can be estimated using conjoint or hedonic techniques.

19. Dr. Tomlin mischaracterizes the articles I cite to support the use of the methods I propose for this case, claiming that "none of these papers calculate the price of online education;

---

[45] Tomlin Report, ¶42.
[46] Tomlin Report, ¶42.

none calculate the value of college characteristics for a single particular college; and none

analyze college pricing during the pandemic."[47] He claims that because this research lacks these

direct parallels to this case, a hedonic regression could not be used in this case. He is wrong on

that, because the articles support the feasibility of the hedonic and conjoint methods and how it is

professionally acceptable to apply them to education (something that Dr. Tomlin claims is not

acceptable; directly refuted by these articles). Also, he is flat wrong about the articles that I cited

in my Initial Declaration. *Firstly*, Matsuda (2007) does investigate the effect of online education,

noting that "distance learning program [is] associated with less tuition [fees]."[48] *Secondly*,

Aucejo et al. (2021) does investigate students' valuations for online versus in-person classes as

well as for college social experiences specifically in the context of the COVID-19 pandemic.

That article determined student valuations based on willingness to pay and found that the

premium that students are willing to pay for in-person instruction relative to a remote format

represents 4.2% of the average annual net cost of attendance. The average student's willingness

to pay for on-campus social activities represents 8.1% of the average annual net costs.[49]

    20. Dr. Tomlin criticizes my suggestion of using datasets like the NCES' Integrated

Postsecondary Education Data System (IPEDS), even though he uses it himself.[50] He argues that

it "does not contain information on specific classes for Yale (*e.g.*, if they were online, in-person,

or a hybrid)."[51] *First*, the IPEDS profile for Yale does record whether students were enrolled in

online courses: as of Fall 2020, 78.1% of undergraduates were enrolled only in distance

---

[47] Tomlin Report, at ¶47.
[48] Initial Macartney Declaration, ¶24, citing Matsuda, Kazuhisa, "Hedonic Prices for College Tuition: Best Value Colleges in the U.S.," August 2007, at pp. 8 & 21.
[49] Initial Macartney Declaration, ¶63, citing Aucejo, Esteban M., et al., "Estimating Students' Valuation for College Experiences," *NBER Working Paper Series*, No. 28511, February 2021.
[50] Tomlin Report, at Table 3, based on IPEDS data.
[51] Tomlin Report, at ¶52.

education, while 21.9% were enrolled in some distance education, and 0% were in-person only.[52]
*Second*, IPEDS is an example of a source of "different colleges' tuition and fees and the different institutions' attributes," as I described in my Initial Declaration.[53] It is indicative that information exists to estimate the value to students across the market for college education, and the relative value of in-person learning relative to online. That Yale may have more information on its own courses (readily available through discovery in this litigation, anyway) than is contained in IPEDS or other sources, is beside the point.

21. Dr. Tomlin also argues that hedonic regression could not be used in this case because "Yale is often considered to be one of the top universities in the world," and thus the specifics of Yale must be considered, and they cannot be (according to Dr. Tomlin).[54] But, as Dr. Tomlin accepts, Yale sets its tuition fees with an eye to what other colleges charge.[55] This demonstrates that there is a market for college education nationwide, even though Dr. Tomlin does not recognize this. Indeed, colleges compete in a national market and students apply to several colleges across the country simultaneously. Therefore, information on the price premium paid for in-person tuition versus online tuition using data across colleges is informative of what that price premium is at Yale. As I described in my Initial Declaration, the strength of the hedonic technique is that it can control for differences across colleges "(*e.g.,* faculty to student ratio, public or private ownership, quality and mix of students, prestige *etc.*)."[56] This is routinely done

---

[52] National Center for Education Statistics, "Yale University," accessed June 8, 2022 at https://nces.ed.gov/ipeds/datacenter/institutionprofile.aspx?unitId=130794.
[53] Initial Macartney Declaration, at ¶59.
[54] Tomlin Report, at ¶50, 54.
[55] Tomlin Report, at ¶50.
[56] Initial Macartney Declaration, at ¶56.

in the literature, as I have described.[57] Furthermore, the hedonic analysis can include data specific to Yale and, as I described previously, conjoint survey analysis can be conducted on Yale students, as well as on college students in general.

## VI. CONCLUSION

22. The factual record specific to this case that I reviewed as part of my Initial Declaration combined with my analysis as described in that Initial Declaration and this Rebuttal Declaration form a sufficient and appropriate economic basis to determine that evidence and methodologies common to the putative Class can be used to determine within a reasonable degree of certainty that: (a) Yale charged an excess above market price for tuition while it kept substantially all classes and other services and activities online for the second half of the Spring 2020 semester and the entirety of the Summer 2020, Fall 2020, and Spring 2021 semesters; and (b) the extent of Yale's excess charges, which can be expressed as a percentage and which can constitute a measure of Class-wide damages when applied to Class members' tuition fees. Once a specific population is set by the court as the appropriate Class, based upon the data provided during discovery in this case and other sources, I can readily calculate the precise Class-wide damages amount through professionally accepted and formulaic economic calculation, to assist the jury or court to set a precise Class-wide damages award. For these reasons and the reasons set forth in this Rebuttal Declaration, I disagree with Dr. Tomlin. Exhibits to be used in support of

---

[57] Initial Macartney Declaration, at ¶57: "For example, Dimkpah et al. (2004) used hedonic price analysis using data on over 600 private, accredited four-year institutions to estimate the implicit prices of quality attributes of colleges in the United States. The authors included 16 independent variables to capture different college attributes, including variables for the number of books in a college's library, the student/faculty ratio, the share of female students, and the year a college was founded, as well as dummy variables indicating whether a college has a religious affiliation, whether a college is ranked as highly or moderately competitive, and whether a college is located in the Northeast/Midwest/West/South."

the opinions stated in this Rebuttal Declaration include all of the tables, graphics and information contained herein as well as the Exhibits cited in or accompanying this Rebuttal Declaration. Additional demonstrative exhibits based upon this same information may be prepared for trial or hearings and used to support my opinions.

June 10, 2022                                    Respectfully submitted,

                                                Gareth Macartney, Ph.D.

# Exhibit A

## Curriculum Vitae of
## Gareth Macartney, Ph.D.



**Gareth James Macartney, Ph.D.**
CEO, Senior Economist, Director of Competition Analytics

Direct: (510) 463-0168
gmacartney@onpointanalytics.com

# INDUSTRY EXPERIENCE

**_Senior Economist, OnPoint Analytics, Inc., 2008 – Present:_**
Dr. Gareth Macartney is the Chief Executive Officer and Director of Competition Analytics at OnPoint. He is a testifying economist with a particular emphasis on liability, impact, and damages analysis in the context of antitrust, intellectual property, breach of contract, and class action cases, among other types of complex litigation. As the Director of the firm's Competition practice, Dr. Macartney also manages work for affiliate experts, supervising staff and overseeing report and testimony preparation. As testifying expert and as manager, Dr. Macartney has analyzed a wide variety of industries, including food and agriculture (packaged seafood, eggs, milk, poultry, fertilizers, fruits), electronic manufacturing (liquid crystal displays, optical disk drives, lithium ion batteries, DRAM), consumer electronics (digital cameras, smartphones, personal computers, network switches), retail (apparel, yoghurt, single-serve coffee, protein bars), online advertising, cryptocurrencies, heavy industry (auto parts, steel, ready-mixed concrete, hard rock mining), transport (rail freight, air cargo), energy (oil, natural gas, gasoline), pharmaceuticals, water, real estate, education, and insurance.

# SELECTED CASES

**_As Expert:_**

_Lincoln Adventures, LLC, et al. v. Those Certain Underwriters at Lloyd's, et al._
Robbins Geller Rudman & Dowd LLP (2017–)
- Class Action, Insurance
- One Declaration

_Jonathan Michel v. Yale University_
The Golan Firm (2022–)
- Class Action, Tuition Fees
- One Declaration

_Marantz Brothers, LLC v. Tate & Lyle Ingredients Americas LLC, et al._
Enenstein, Pham & Glass LLP (2021–)
- Antitrust, Bar Fiber
- Two Expert Reports, One Deposition

_Cryptocurrency Patent Valuation_
Haug Partners, LLP (2020)
- Patent Valuation
- One Valuation Report

*Micron Technology, Inc. v. United Microelectronics Corporation, et al.*
Dan Johnson Law Group, LLP (2019–2021)
- Trade Secrets, DRAM
- Two Expert Reports

*In Re: Packaged Seafood Products Antitrust Litigation*
Ahern and Associates, P.C. (2019–)
- Antitrust, Packaged Seafood
- Two Expert Reports, Two Depositions

*JBR, Inc. (d/b/a Rogers Family Co.) v. Keurig Green Mountain, Inc.*
Dan Johnson Law Group, LLP (2018–)
- Antitrust, Single-Serve Coffee
- Four Expert Reports, One Deposition

*Ipsilium LLC v. Cisco Systems, Inc.*
Dan Johnson Law Group, LLP (2018–2019)
- Patent Damages, Network Switches
- Analysis for Preliminary Damages Contentions

*Engquist, et al. v. City of Los Angeles*
Wolf Haldenstein Adler Freeman & Herz LLP (2018–2020)
- Taxation Class Action, Gas Utility Taxes
- Two Expert Declarations

*Altela, Inc. v. Arizona Science and Technology Enterprises, et al.*
The Miller Law Firm, P.C. (2018)
- Breach of Contract, Water Treatment Technology
- One Expert Report, One Deposition, Arbitration Testimony

*Acer, Inc., et al. v. Lite-On IT Corp., et al.*
TechKnowledge Law Group, LLP (2015–2019)
- Antitrust, Optical Disk Drives
- Two Expert Reports, Two Depositions

*Fujifilm Corporation v. Motorola Mobility, LLC*
Morgan, Lewis & Bockius, LLP (2015–2016)
- Patent Damages, Smartphone Technology
- Two Expert Reports, One Deposition, Jury Trial Testimony

*Eastman Kodak Company v. Epson Imaging Devices Corporation, et al.*
Nixon Peabody, LLP (2011–2013)
- Antitrust, Liquid Crystal Display Panels
- Three Expert Reports, Two Depositions

*Attorney General of Mississippi v. Yazaki North America, Inc., et al.*
Hazzard Law, LLC (2015–2019)
- Antitrust, Automotive Wire Harnesses
- Two Declarations

*Acer Inc., et al. v. Samsung SDI Co., LTD., et al.*
TechKnowledge Law Group, LLP (2015–2018)
- Antitrust, Lithium-Ion Batteries

*Acer America Corp., et al. v. Hitachi, Ltd., et al.*
TechKnowledge Law Group, LLP (2014–2015)
- Antitrust, Liquid Crystal Display Panels

*Home Depot USA, Inc. v. AU Optronics Corp., et al.*
Bryan Cave, LLP (2015)
- Antitrust, Liquid Crystal Display Panels

*Teramura, et al. v. Walgreen Co., d/b/a Walgreens*
Sanford Law Firm, LLP (2014)
- Wage & Hour Class Action, Retail
- Two Expert Reports

*NextBus, Inc. v. NextBus Information Systems*
Wm. Kochenderfer, PC (2012)
- Breach of Contract, Real Time Passenger Information Technology & Advertising
- One Expert Report

### ***As Manager:***

<u>Antitrust</u>
*Ryder Limited and Hill Hire Limited v. Man SE et al.*
Ashurst, LLP (2018–)

*Winn-Dixie Stores, Inc. and Bi-Lo Holdings, LLC v. Southeast Milk, Inc., et al.*
Ahern and Associates, P.C. (2016–2019)

*In Re: Rail Freight Fuel Surcharge Antitrust Litigation*
Hausfeld, LLP, Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP (2010–)

*In Re: Processed Egg Products Antitrust Litigation*
Hausfeld, LLP (2008–2018)

*In Re: Wholesale Grocery Products Antitrust Litigation*
Kotchen & Low, LLP (2016–2017)

*Fond du Lac Bumper Exchange, Inc., et al. v. Jui Li Enterprise Company, Ltd., et al.*
Karon, LLC (2014–2016)

*Reorganized Farmland Industries v. OneOk, Inc., et al.*
Sharp McQueen, P.A. (2015–2021)

*In Re: Pool Products Distribution Market Antitrust Litigation*
Kaplan, Fox & Kilsheimer, LLP (2013–2016)

*In Re: Northeastern Milk Antitrust Litigation*
Howrey, LLP (2011–2016)

*In Re: Air Cargo Shipping Services Antitrust Litigation*
Hausfeld, LLP (2012–2013)

*In Re: Southeastern Milk Antitrust Litigation*
Howrey, LLP (2010–2013)

*Stanislaus Food Products v. USS-POSCO Industries et al.*
Lieff, Cabraser, Haimann & Bernstein, LLP (2012)

*In Re: Potash Antitrust Litigation*
Pearson, Simon & Warshaw, LLP (2010–2011)

*In Re: Ready-Mixed Concrete Antitrust Litigation*
Cohen & Malad, LLP (2008–2010)

<u>Intellectual Property</u>
*Eli Lilly and Company v. Mayne Pharma USA, Inc. et al.* (Gemzar)
Winston & Strawn, LLP (2010)

*Impax Laboratories, Inc., v. Shire, LLC et al.* (Adderall XR)
Frommer, Lawrence & Haug, LLP (2010)

*Aspex Eyewear, Inc. and Contour Optik, Inc. v. Hardy Life, LLC, et al.*
Sheppard, Mullin, Richter & Hampton, LLP, Frommer, Lawrence & Haug, LLP (2010)

*Eli Lilly and Company v. Hospira, Inc., et al.* (Gemcitabine)
Winston & Strawn, LLP (2009)

*Santarus, Inc. and the Curators of the University of Missouri v. Par Pharmaceutical, Inc.* (Zegerid)
Arent Fox, LLP (2009)

*Forest Laboratories, Inc., et al. v. Caraco Pharmaceutical Laboratories, Ltd.* (Lexapro)
Winston & Strawn, LLP (2008–2009)

*Novo Nordisk A/S and Novo Nordisk Inc. v. Caraco Pharmaceutical Laboratories, Ltd. and Sun Pharmaceutical Industries, Ltd.* (Prandin)
Winston & Strawn, LLP (2008)

Breach of Contract
*Fowler Packing Company v. Sun Pacific Shippers, Paramount Citrus Association, et al.*
Gibson, Dunn & Crutcher, LLP (2016)

*Tula Foods, Inc. v. The Kroger Co.*
Vorys, Sater, Seymor, and Pease, LLP (2014)

*AgroSource, Inc. v. Sipcam Agro USA, Inc.*
Wiley Rein, LLP (2012)

*Frank K. Cooper Real Estate #1, Inc., et al. v. Cendant Corporation and Century 21 Real Estate Corporation*
Zwerling, Schachter & Zwerling, LLP (2009–2011)

*Road Ranger v. Citgo*
Stahl Cowen Crowley Addis, LLC (2009)

Environmental
*Freeport-McMoRan Inc., Comment Re: Proposed Rule for Financial Responsibility Requirements under CERCLA § 108(b) for Classes of Facilities in the Hardrock Mining Industry*
Vinson & Elkins, LLP (2010–2017)

*Roosevelt Irrigation District v. Salt River Project Agricultural Improvement and Power District, et al.*
Bonnett, Fairbourn, Friedman and Balint, P.C. (2015–2016)

*Clyde Litchfield, et al. v. Onstott Dusters, Inc. et al.*
McCormick, Barstow, Sheppard, Wayte & Carruth, LLP (2009)

*State of Oklahoma v. Tyson Foods, Inc. et al.*
Ryan, Whaley & Coldiron, LLP (2009)

Product Labelling
*Austin Rugg and Jennifer Fish, et al. v. Johnson & Johnson*
The Golan Firm (2019-2020)

*Siobhan Morrow, et al. v. Carter's, Inc, et al.*
Carlson Lynch Sweet Kilpela Carpenter, LLP (2017–2018)

*Leah Segedie, et al. v. the Hain Celestial Group, Inc.*
Finkelstein, Blankinship, Frei-Pearson & Garber, LLP (2016–2018)

*Rosminah Brown, et al. v. the Hain Celestial Group, Inc.*
Lexington Law Group (2014)

Insurance
*Certain Underwriters at Lloyd's Severally Subscribing Policy Number DP359504 et al. v. Tyson Foods, Inc.*
Dickstein Shapiro, LLP (2009–2010)

Taxation
*Estuardo Ardon, et al. v. City of Los Angeles*
Wolf Haldenstein Adler Freeman & Herz, LLP (2013–2014)

*Carla Villa and Vanessa Garza, et al. v. City of Chula Vista*
Capretz & Associates (2012)

# EDUCATION

**University College London,** London, England
*Ph.D. Economics* | 2008 | Title: "Market Institutions and Firm Behavior: Output and Innovation in the Face of Reform"

**Royal Holloway College, University of London,** London, England
*M.Sc. Economics* | 2003 | Distinction

**Exeter College, Oxford University,** Oxford, England
*B.A. Physics* | 1996 | Class 2:1

# PUBLICATIONS

Economic Principles for Class Certification Analysis in Antitrust Cases (joint with Gordon Rausser), *Antitrust Magazine, Section of Antitrust Law, American Bar Association*, Spring 2016, vol. 30, no. 2, pp. 60-67

Rising Standards for Class Certification: Implications for Economic Analysis (joint with Gordon Rausser), *The Journal of Business and Economics,* March 2016, vol. 7, no. 3, pp. 836-870

Employment Protection Legislation, Multinational Enterprises and Innovation (joint with Rachel Griffith), *The Review of Economics and Statistics*, March 2014, vol. 96, no. 1, pp. 135-150

Antitrust Class Proceedings – Then And Now (joint with Michael Hausfeld, Gordon Rausser, Michael Lehmann and Sathya Gosselin), *The Law and Economics of Class Action*s, *Research in Law and Economics*, 2014, vol. 26, pp. 77-133

The Location of Innovative Activity in Europe (joint with Laura Abramovsky, Rachel Griffith and Helen Miller), *The Institute for Fiscal Studies,* July 2008, Working Paper 08/10

Product Market Reforms, Labour Market Institutions and Unemployment (joint with Rachel Griffith and Rupert Harrison), *The Economic Journal,* March 2007, vol. 117, no. 519, pp. C142-C166

# SCHOLARSHIPS AND AWARDS

- Best Academic Private Enforcement Article, 2015 Antitrust Writing Awards, Concurrences Journal and George Washington University's Competition Law Center
- Advanced Institute of Management Scholarship 2004–2007
- University College London, Department of Economics, W. M. Gorman Scholarship
- University College London, Department of Economics, Honorable Mention in Teaching Assistant Awards

## PRIOR EMPLOYMENT

**Ph.D. Scholar**, the Institute for Fiscal Studies, London, UK, 2004–2007
- Academic and industry research with the Productivity and Innovation team of a leading UK research institute
- Funded by the institute through Ph.D. program

**Teaching Assistant**, Department of Economics, University College London, 2003–2007
- Undergraduate courses in Industrial Organization, Macroeconomics, and Econometrics

**Consultant**, Corporate Banking and Financial Markets, Royal Bank of Scotland, PLC, 2002 (May to Oct)
- Managed reconciliation exercise between two departments of the bank, reporting to senior bank personnel

**Analyst**, Group Risk, Royal Bank of Scotland, PLC, 1999–2001
- Designed and managed creation of credit risk reporting software
- Passed financial regulator's exams in securities and derivatives

**IT Consultant**, Logica UK Ltd, 1997–1999
- Consultancy in energy, transportation, and defense sectors

## CONFERENCES AND PRESENTATIONS

From Estimation to Prediction in Economic Analysis at Class Certification, presented at:
    Festschrift in Honor of Gordon Rausser, University of California, Berkeley, October 2019

Law & Economics, Panel Participant at:
    Festschrift in Honor of Gordon Rausser, University of California, Berkeley, October 2019

Damage Analysis in Intellectual Property Litigation, presented at:
    Bar Association of San Francisco, Barristers Club, Continuing Legal Education, November 2016

Antitrust Class Proceedings – Then and Now, presented at:
    Class Action Landscape: Yesterday, Today and Tomorrow – Perspectives in Law and Economics, Research in Law and Economics Conference 2013, Boston

Firm Investment in Innovation and Fixed Assets: The Effect of US Tax Reforms that Reduced the Relative Price of Equity to Debt, presented at:
    Productivity, Innovation & Intellectual Property Series 2007, London School of Economics

Competition and Innovation, presented at:
    Oxford University and Cambridge University, Institute for Fiscal Studies, Public Economics Lecture Series, February 2007

Product Market Reforms, Labour Institutions and Unemployment, presented at:
    European Economics Association Congress 2006, Vienna University
    Royal Economic Society Conference 2006, Nottingham University

Matching Firm Accounts to Patents, presented at:
    European Policy on Intellectual Property Conference 2006, Bocconi University, Milan

Gareth James Macartney, Ph.D.
Page 8 of 8

# REFEREE ACTIVITY

The European Economic Review, the Journal of Competition Law and Economics, the Economics of Transition, Oxford Economic Papers, and Fiscal Studies

# Exhibit B

## Materials Reviewed and Relied Upon

**Legal Documents and Pleadings**

Defendant's Objections and Responses to Plaintiff's First Set of Interrogatories, April 20, 2021

Second Amended Class Action Complaint and Demand for Jury Trial, filed July 29, 2021

Yale University's Answer and Affirmative Defenses To Plaintiff's Second Amended Class
     Action Complaint, filed September 20, 2021


**Expert Reports and Declarations**

Declaration of Gareth Macartney, Ph.D., in the matter of Jonathan Michel v. Yale University,
     USDC, District of Connecticut, Case No. 3:20-cv-01080-SALM, dated February 4, 2022

Expert Report of Jonathan T. Tomlin, Ph.D., in the matter of Jonathan Michel v. Yale University,
     USDC, District of Connecticut, Case No. 3:20-cv-01080-SALM, dated June 3, 2022


**Articles, Books, an Industry Reports**

Aratani, Lauren, "'Zoom University': is college worth the cost without the in-person
     experience?", *The Guardian*, October 6, 2020, accessed January 29, 2022 at
     https://www.theguardian.com/world/2020/oct/06/zoom-university-college-cost-students-
     in-person-experience

Aucejo, Esteban M., et al., "Estimating Students' Valuation for College Experiences," *NBER
     Working Paper Series*, No. 28511, February 2021

Dimkpah, Young O., et al., "The Impact of College Quality on Tuition: A Hedonic Analysis,"
     *Journal for Economic Educators* 4, no. 2 (Winter 2004)

Hoxby, Caroline M., "How the Changing Market Structure of U.S. Higher Education Explains
     College Tuition," *NBER Working Paper Series*, no. 6323, December 1997

Hoxby, Caroline M., "The Economics of Online Postsecondary Education: MOOCs,
     Nonselective Education, and Highly Selective Education," *The American Economic
     Review – Papers & Proceedings* 104, no. 5 (May 2014): 528-533

Lapovsky, Lucy, "Institutional Financial Health: Tuition Discounting and Enrollment
     Management," December 2001, National Center for Education Statistics, Postsecondary
     Education Descriptive Reports

Matsuda, Kazuhisa, "Hedonic Prices for College Tuition: Best Value Colleges in the U.S.,"
     August 2007

Winston C. Gordon, "Subsidies, Hierarchy and Peers: The Awkward Economics of Higher
     Education," *Journal of Economic Perspectives*, Winter, 1999

Winston C. Gordon (2000), "The Positional Arms Race in Higher Education." Discussion Paper

Winston C. Gordon, "Higher Education's Costs, Prices, and Subsidies: Some Economic Facts and Fundamentals," December 2001, National Center for Education Statistics, Postsecondary Education Descriptive Analysis Reports

## Websites

Hanson, Melanie, "Cost of Online Education vs. Traditional Education," Education Data Initiative, August 18, 2021, accessed January 30, 2022 at https://educationdata.org/cost-of-online-education-vs-traditional-education.

Hemelt, Steven W. and Kevin M. Stange, "Why the move to online instruction won't reduce college costs," July 28, 2020, accessed June 8, 2022 at https://www.brookings.edu/blog/brown-center-chalkboard/2020/07/28/why-the-move-to-online-instruction-wont-reduce-college-costs/.

Integrated Postsecondary Education Data System, "Use the Data," accessed January 28, 2022 at https://nces.ed.gov/ipeds/use-the-data

National Center for Education Statistics, "Yale University," accessed June 8, 2022 at https://nces.ed.gov/ipeds/datacenter/institutionprofile.aspx?unitId=130794

The Daily Princetonian, "Why Princeton should make fall 2020 discounts apply to expected family contribution", June 21, 2020.

U.S. News & World Report, "Methodology: Best Online Bachelor's Programs Rankings," accessed June 7, 2022 at https://www.usnews.com/education/online-education/articles/bachelors-methodology

Yale, "Yale Facts," accessed February 3, 2022 at https://www.yale.edu/about-yale/yale-facts

## Bates-Numbered Documents

YU-0000000690

YU-0000016105

YU-0000034090